**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

Marianne Heffner, Bryan
Mazurkiewicz, Michigan Safe
Transfer Center, LLC, Legal Real
Estate, LLC, and Michael Greiner,

Case No. 15-cv-13687

Judith E. Levy
United States District Judge

Plaintiffs,

v.

City of Warren, James R. Fouts,
Lynn Martin, Everett Murphy,
Jere Green, Kevin Dailey, Sean
Johnston, and City of Warren
Police Department Officers 1-8,

Defendants.

_____/

**OPINION AND ORDER DISMISSING JAMES R. FOUTS, LYNN
MARTIN, EVERETT MURPHY, AND JERE GREEN AS
DEFENDANTS, GRANTING DEFENDANTS' MOTIONS FOR
SUMMARY JUDGMENT [82, 110], AND DENYING THE CITY OF
WARREN'S MOTION FOR AN ORDER OF CONTEMPT [88]**

This case involves alleged constitutional and state-law violations

arising from two searches of a commercial property in Warren,

Michigan, pursuant to an unspecified policy of defendant the City of

Warren ("Warren"), targeting either medical marijuana generally or

medical marijuana dispensaries specifically. Following two amended complaints, plaintiffs now allege that Warren and numerous Warren Police Department officers are liable for the aforementioned violations. What plaintiffs have not done is allege that defendants James R. Fouts, Lynn Martin, Everett Murphy, and Jere Green have violated any law. Defendants now move for summary judgment as to the claims asserted (or not asserted) against them, and Warren moves for an order of contempt against plaintiffs Michael Greiner and Bryan Mazurkiewicz. For the reasons set forth below, defendants' motions for summary judgment are granted, and Warren's motion for an order of contempt is denied.

## I.     Background

Plaintiffs initially filed suit on September 28, 2015, in Michigan state court. The suit was timely removed on October 19, 2015. (Dkt. 1.) Initially, the plaintiffs included twenty-three individuals and two LLCs. (*Id*. at 8.) Following a series of stipulated dismissals and amended complaints, plaintiffs now consist of Marianne Heffner, Bryan Mazurkiewicz, Michael Greiner, Michigan Safe Transfer Center, LLC ("MSTC"), and Legal Real Estate, LLC. (Dkt. 59.)

On October 21, 2015, Warren moved for a temporary restraining order seeking to prevent occupancy of the property located at 29601 Hoover Road by MSTC and Legal Real Estate, LLC, based on various ordinance violations. (Dkt. 3.) That day, the Court held a telephonic conference regarding the motion and denied it without prejudice, converting it into a motion for a preliminary injunction. Following briefing, the Court held a hearing on the motion on November 19, 2015, and on November 20, 2015, granted the preliminary injunction in part and denied it in part. (Dkt. 12.)

In the time between the partial granting of that preliminary injunction and the October 30, 2017 hearing on the above-referenced motions for summary judgment and for an order of contempt, the Court held nine different telephonic conferences regarding discovery and other disputes, and on September 1, 2016, held a hearing on a prior motion for partial summary judgment filed by defendants.

Plaintiffs Heffner and Mazurkiewicz are "primary caregivers" within the meaning of the Michigan Medical Marihuana Act ("MMMA"). MICH. COMP. LAWS § 333.26423(k). Heffner and Mazurkiewicz are also "qualified patients" within the meaning of the MMMA. MICH. COMP.

LAWS § 333.26423(l).  Legal Real Estate, LLC, managed by Greiner, has a valid certificate of occupancy, issued by defendant the Warren, for Suite A of the real property located at 29601 Hoover Road in Warren, Michigan.  Legal Real Estate, LLC is also the owner of the building.  Suite A is approved for use as a "law office."  (Dkt. 27-9.)

Plaintiff MSTC also operated out of Suite A, "conducting transfers of medical marihuana" pursuant to the MMMA.  (Dkt. 94 at 10; Dkt. 79-3.)  MSTC, managed by Mazurkiewicz, wanted to operate out of Suite B and the basement of the building.  On March 10, 2015, MSTC submitted a certificate of compliance application to Warren.  (Dkt. 3-12 at 2.)  The application was required to occupy any part of the building, for Suite B, with the disclosed use of "consultation/transfer goods services."  (*Id.*)  The application was rejected for failing to disclose the actual use of the space, and MSTC submitted a revised certificate of compliance application on March 12, 2015, which had attached to it a series of proposed uses as a patient/caregiver transfer club.  (*Id*. at 4-5.)

Also on March 12, 2015, Warren inspected the building and discovered that MSTC was operating out of Suite B, which led to a citation for Legal Real Estate, LLC.  (Dkt. 3-15.)  The second certificate

of compliance application was denied on March 13, 2015, because the transfer center was not a permitted use on that land. (Dkt. 3-14.) After that citation, MSTC moved its operations fully to Suite A. (Dkt. 79-5 at 7.)

MSTC twice more applied for a certificate of compliance for Suite B on March 19, 2015, and March 30, 2015, and was rejected each time. (Dkt. 79 at 10-11.) On July 7, 2015, the Warren Police Department ("WPD") received an anonymous tip that there was illegal drug activity at the property, and began an investigation. (Dkt. 110-16 at 13.) An internet search revealed that MSTC operated out of the property, and WPD looked for MSTC's registration and permits. (*Id.*) Finding no registration for a medical marijuana dispensary at that location, WPD's Special Investigation Division began surveillance on the property. (*Id.*) That same day, WPD officers surveilling the property stopped two cars as they were leaving the property, and found marijuana in both cars. (*Id.* at 14.) Both drivers told the officers that they had purchased the marijuana from MSTC, and that the person who provided each of them with the marijuana was not their registered caregiver. (Dkt. 110-2 at 5.)

After WPD found marijuana in both cars, WPD officer Nicholas Lienemann returned to headquarters to write an affidavit to obtain a search warrant. (Dkt. 110-16 at 14.) Meanwhile, the "five to seven officers" (Dkt. 110-19 at 3) still on the scene at the property entered MSTC and "secured the scene awaiting arrival" of the warrant. (Dkt. 110-16 at 14.) They entered MSTC through the front door used by customers, (Dkt. 110-19 at 3), and were armed when they did so. (Dkt. 112-2 at 11.)

The officers first encountered former plaintiff Justin Felix, who was seated at the MSTC reception desk. (Dkt. 110-19 at 3.) Felix put his "hands up immediately" and greeted the officers. (*Id.* at 4.) The officers asked Felix if there was anyone else in the building, and Felix told them that Mazurkiewicz was in the basement. (*Id.*) The officers then searched Felix, taking his wallet and phone from him, and directed him to open a locked door leading into the back area and basement of MSTC. (*Id.*) The officers instructed Felix to unlock the door to the basement, he complied, and the officers went down to the basement to find Mazurkiewicz. (*Id.* at 4-5.) The officers brought Mazurkiewicz up

to the lobby and detained both Mazurkiewicz and Felix there for the remainder of the search.  (Dkt. 110-21 at 3.)

Once the officers finished securing the premises, the parties differ as to what occurred next.  Defendant Sean Johnston, the detective in charge of the search, (Dkt. 112-3 at 6), testified that after the officers brought both Felix and Mazurkiewicz into the lobby of the building, the officers waited until a warrant was obtained to begin searching.  (Dkt. 112-3 at 20.)  This version of events is also reflected in the police report prepared the next day by an unknown officer.  (Dkt. 110-16 at 14-15.) According to that police report, WPD officers entered 29601 Hoover Road at 6:10 P.M. and the warrant was signed and delivered to the premises two hours later, at 8:10 P.M.  (Dkt. 110-16 at 14-15.)

Felix testified that after the officers secured him and Mazurkiewicz in the lobby, the officers picked up Post-It notes off of a desk and placed them over the surveillance cameras in the building. (Dkt. 110-19 at 5.)  Felix did not state, however, that the officers began searching the property after placing the Post-It notes over the cameras. He and Mazurkiewicz were kept in the lobby for "three to five" hours under the supervision of an officer.  (*Id.*)  Mazurkiewicz testified they

were in the lobby for "four hours." (Dkt. 110-21 at 3.) At some point during this time, Felix asked Johnston if they had a warrant to search the property. (Dkt. 110-19 at 6.) According to Felix, Johnston responded by telling Felix to "watch [his] mouth unless [he] wanted things to get a lot worse." (*Id.*) Mazurkiewicz also asked Johnston if they had a warrant. (*Id.*) Felix testified that Johnston told Mazurkiewicz that "unless they wanted [the police] to come in with sledge hammers and start breaking the place up that [they] should shut up." (*Id.*)

Once the search actually commenced, the parties' stories converge. Felix assisted the officers by opening marijuana storage lockers, the door to a marijuana growing room, and the basement of the building. (Dkt. 110-19 at 4.) After a "couple of hours" Mazurkiewicz called Greiner (Dkt. 110-21 at 3), who arrived on the scene "shaking" and "obviously flustered." (Dkt. 112-4 at 6.) Defendant Kevin Dailey handcuffed Greiner until he calmed down – about ten minutes – and then allowed him to wait out the duration of the search in the lobby with his clients. (*Id.*) Johnston testified that while Greiner was handcuffed, Johnston showed Greiner the warrant to help him calm

down.  (Dkt. 112-3 at 22.)  Defendants left a copy of the search warrant at MSTC when they departed.  (Dkt. 110-19 at 6.)

The warrant authorized WPD to search the premises at 29601 Hoover Road and seize:

> [a]ny and all illegally possessed controlled substances, such as, but not limited to: . . . Marijuana . . . All valuables and/or proceeds (money) related to drug sales. Any drug paraphernalia utilized for processing, weighing, packaging, cultivating, distribution, dilution and consumption of a controlled substance. All proofs as to occupants and/or residents of the premises, as well as safes and lock boxes utilized to secure drugs and drug proceeds. All records and ledgers related to drug sales, including computer hard drives, software, hardware, monitors, printers, cell phones and accessories.

(Dkt. 110-2 at 4.)  WPD recovered over 400 grams of marijuana and over 12,000 grams of marijuana byproducts (edibles) in the search. However, WPD made no arrests, the district attorney did not file charges, and MSTC continued to operate.  (Dkt. 110-21 at 3.)

Two months later, on September 18, 2015, WPD conducted a second search of the property.  (Dkt. 110-22.)  This search came about when WPD conducted traffic stops of plaintiff Marianne Heffner and former plaintiff James Satterfield as they left 29601 Hoover Road, and it was learned that they had purchased marijuana from individuals who

were not their registered caregivers. (*Id.*) WPD used the evidence obtained in those stops as probable cause for a warrant to search MSTC again. (Dkt. 110-3.) During the stops Johnston told Heffner and Satterfield that they needed to "fill out a statement." (Dkt. 112-6 at 11.) Heffner testified that she "wrote exactly what he told me to write" (*id.*) and Satterfield testified that he "wrote down whatever they were telling me to write." (Dkt. 112-7 at 10.) Each was issued a citation and allowed to leave the scene. (Dkt. 110-3 at 3.) The written statements themselves were not made part of the affidavit supporting the September 18, 2015 search warrant. (*See id.*)

Defendants claim that the officers were in the vicinity of 29601 Hoover Road on an "unrelated matter" when they observed drug activity at the property. (Dkt. 110-22 at 8.) Plaintiffs take issue with this characterization and assert that WPD was in the area as part of an ongoing investigation of MSTC, as Johnston indicated in his deposition. (Dkt. 112-3 at 9-10.)

The parties agree that the September 18, 2015 search began when police approached the door of MSTC and called a phone number listed on a notice on the door. (Dkt. 110-21 at 4, 112-3 at 19-20.) Defendants

maintain that they were allowed in to the building without incident. However, Mazurkiewicz testified that Johnston "threatened to break the door" if Mazurkiewicz did not let the police in to the building. (Dkt. 110-21 at 4.) The parties agree that Mazurkiewicz opened the door and allowed the police into the building. (*Id.*) He and Felix were again detained together in the lobby of the building while WPD searched for three to five hours. (110-19 at 8.) Greiner also appeared on the scene and was detained in the lobby along with Mazurkiewicz and Felix. (*Id.*) WPD again left a copy of the search warrant at MSTC as they departed. (*Id.*)

The warrant for the September 18, 2015 search authorized WPD to search the premises at 29601 Hoover Road and seize:

> Any and all illegally possessed controlled substances, such as, but not limited to: . . . Marijuana . . . All valuables and/or proceeds (money) related to drug sales. Any drug paraphernalia utilized for processing, weighing, packaging, cultivating, distribution, dilution and consumption of a controlled substance. All proofs as to occupants and/or residents of the premises, as well as safes and lock boxes utilized to secure drugs and drug proceeds. All records and ledgers related to drug sales, including computer hard drives, software, hardware, monitors, printers, cell phones and accessories.

(Dkt. 110-3 at 2.) WPD seized 4,691.9 grams of loose and edible marijuana. (Dkt. 110 at 22.) It also seized an unspecified number of MMMA patient and caregiver cards. (Dkt. 112-3 at 7.) Again, no arrests were made and no charges were filed against plaintiffs. (Dkt. 110 at 22.)

Plaintiffs' second amended complaint, filed on September 12, 2016, asserts the following claims: 1) violation of Mazurkiewicz's right to liberty under the Fourteenth Amendment based on unlawful imprisonment during the two searches; 2) violation of plaintiffs' right to procedural due process based on the seizure of property in the two searches and failure to return that property; 3) violation of plaintiffs' right to protection from unreasonable search and seizure under the Fourth Amendment when the police officers conducted an allegedly warrantless search on July 7, 2015; 4) violation of plaintiffs' rights to equal protection under the Fourteenth Amendment based on Warren's efforts to stop the lawful transfer of medical marijuana; and 5) false imprisonment. (*See* Dkt. 59.)

On March 31, 2017, Fouts, Martin, Murphy, Green and Warren filed a motion for summary judgment, with the individual defendants

arguing that no claims were asserted against them, and Warren arguing that summary judgment was proper as to any municipal liability claim asserted against it. (Dkt. 79.) On July 13, 2017, Johnston and Dailey filed a motion for summary judgment as to all claims asserted against them. (Dkt. 110.) On April 28, 2017, Warren also filed a motion for sanctions against Mazurkiewicz and Greiner for failure to comply with the Court's prior order regarding inspection of the Hoover Road property. (Dkt. 88.)

Oral argument was scheduled for these motions on October 30, 2017. The Court discussed the possibility of settlement with the parties in lieu of argument, and the parties attempted to resolve their dispute. On February 6, 2018, the parties informed the Court that settlement was not possible, and the Court informed the parties that it would determine these motions on the briefs pursuant to E.D. Mich. Local R. 7.1(f)(2). Warren also submitted a declaration in support of their motion for sanctions on February 9, 2018. (Dkt. 123.)

## II.  Legal Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled

to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may not grant summary judgment if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court "views the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party." *Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co.*, 95 F. App'x 132, 135 (6th Cir. 2004) (citing *Skousen v. Brighton High Sch.,* 305 F.3d 520, 526 (6th Cir. 2002)).

## III. Analysis

### A. Claims Against Fouts, Martin, Murphy, and Green

Plaintiffs' complaint asserts two broad counts: one for "violation of 42 USC § 1983" and one for false imprisonment under Michigan law. The § 1983 count asserts claims for violation of substantive and procedural due process rights under the Fourteenth Amendment, unreasonable search and seizure under the Fourth Amendment, and equal protection under the Fourteenth Amendment. (Dkt. 59 at 13-14.) The substantive due process claim, although referencing defendants generally, is asserted only against the officers whom Mazurkiewicz and

Greiner claim unlawfully imprisoned them. (*Id*. at 14.)[1] The procedural due process claim is only asserted against the officers, as well. (*Id*.) The unreasonable search and seizure is asserted against the officers who conducted an alleged warrantless search on July 7, 2015. (*Id*.) The equal protection claim is asserted against Warren. (*Id*.) The false imprisonment claim is asserted against the officers who detained Mazurkiewicz and Greiner. (*Id*. at 15-28.)

Defendants James R. Fouts, Lynn Martin, Everett Murphy, and Jere Green have no claims asserted against them in the complaint. Fouts, the mayor of Warren, is referenced only as having "suggested Regulations related to medical marijuana [i]n his State of the City speech on or about April 15, 2015, . . . that would violate of the Michigan Supreme Court's ruling in *Ter Beek v. City of Wyoming*, 495 Mich. 1 (2014)." (*Id*. at 8.) Martin, the former Warren Chief Zoning Inspector, is mentioned as having "told Plaintiff Bryan Mazurkiewicz on

---

[1] The count states that "Plaintiffs Bryan Mazurkiewicz and Justin Felix's rights to liberty were violated when Defendants unlawfully imprisoned them during the two fruitless searches of the Property." (Dkt. 59 at 14.) However, plaintiffs also allege that on July 7, 2015 and September 18, 2015, "police officers from Defendant City of Warren" and "City of Warren Police" conducted the raids at issue in the substantive due process claim. (*Id*. at 9-11.) No other defendants are alleged to have participated in the raids, and the claim makes clear that it is only asserted against the defendants that participated in the "two fruitless searches of the Property." There are no allegations against any non-officer defendant.

separate occasions 'you can't grow marihuana in Warren' and 'we don't want those kind of people here.'" (*Id.*) Murphy, the current Warren Chief Zoning Inspector, is referenced as having "repeatedly told Plaintiff Bryan Mazurkiewicz that Plaintiffs were in violation of Warren zoning ordinances," having issued plaintiffs tickets for zoning violations, and threatening to continue ticketing them for zoning violations. (*Id.* at 8-9.) Green, the Warren Police Commissioner, is referenced as having "sent a letter dated August 15, 2015, to Plaintiffs, ordering them to cease any illegal activity in Suite B of the Property." (*Id.* at 10.)

Plaintiffs do not address this deficiency in their response to these defendants' motion for summary judgment. Instead, plaintiffs argue that Fouts and Green committed acts that could lead to municipal liability for Warren (Dkt. 94 at 22-24), that Martin performed acts that would potentially undercut Warren's defenses to the § 1983 claims (*id.* at 26-27), and that Murphy performed acts that would make summary judgment as to an unspecified claim inappropriate. (*Id.* at 27.) Green is referenced as having played "a policy role in fighting the application of

the state law on medical marijuana," (*Id*. at 23), but this reference is made only in support of the municipal liability claim against Warren.

Plaintiffs argue that "prior complaints, including the final amended one, did plead these claims against all Defendants." (Dkt. 94 at 9.) The operative complaint in this case pleads no claims against Fouts, Martin, Murphy, or Green. Amended complaints supplant all prior pleadings, and a plaintiff cannot argue that multiple complaints are effective at the same time, or that they may retain abandoned claims from prior complaints.

Although it is unclear from their response brief, it appears that plaintiffs are arguing that Fouts, Martin, Murphy, and Green's roles as decision makers would somehow make them jointly or separately liable for the municipal acts of Warren. However, municipal liability as set forth in *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978) applies "only . . . when it can be fairly said that the *city itself* is the wrongdoer." *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 122 (1992) (emphasis added). Although the actions of officials may serve as evidence of a municipality's wrongdoing, they do not expose the officials

themselves to liability unless some separate claim is asserted against those officials for their actions.

Because no claims are asserted against Fouts, Martin, Murphy, and Green, the Court must dismiss these four defendants from this case.

## B. Claims Against Dailey, Johnston, and Unknown Officers

When "discovery is closed and [p]laintiff [] has not identified Officer Doe, the Court dismisses Officer Doe from the case." *Johnson v. City of Ecorse*, 137 F. Supp. 2d 886, 892 (E.D. Mich. 2001) (citing *Hindes v. FDIC*, 137 F.3d 148, 155 (3d Cir. 1998)). Discovery is now closed, and plaintiffs have not moved to amend their complaint to identify the eight unknown WPD officers. Plaintiffs' claims against the unknown officers are dismissed.

Dailey and Johnston contend that they are entitled to qualified immunity with regard to the constitutional claims arising out of the two searches. The Supreme Court outlined the two part analysis for qualified immunity in *Saucier v. Katz*, 533 U.S. 194 (2001). One part of the analysis is whether "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct

violated a constitutional right?" *Id.* at 201. The other part of the analysis is to ask "whether the [allegedly violated] right was clearly established." *Id.* The "clearly established" inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.*

There is no rigid order in which this test must proceed. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Courts "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.*

Each of the constitutional claims is asserted against Dailey and Johnston, and concerns alleged harms experienced by Mazurkiewicz or Greiner. Despite her inclusion as a plaintiff, the complaint asserts no claims on behalf of Heffner, and it is unclear whether Michigan Safe Transfer LLC, or Legal Real Estate, LLC are asserting claims. The claims at issue with regard to Dailey and Johnston are:

1) Violation of the "substantive right to liberty," defined as unlawful imprisonment. (Dkt. 59 at 13, 14.)

2) Violation of "procedural due process," defined as the seizure of certain property from plaintiffs that defendants have refused to return. (*Id.* at 14.)

3) "[U]nreasonable search and seizure," in which plaintiffs allege the July 7, 2015 search was warrantless. (*Id.*)

4) False imprisonment under Michigan law. (*Id.* at 15-28.)

Dailey and Johnston move for summary judgment with respect to each of these claims.

First, plaintiffs' response to the motion for summary judgment only addresses the unreasonable search and seizure/warrantless search claim. "[A] plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment." *Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013). Accordingly, the Court must grant summary judgment to Dailey and Johnston on the constitutional and state law false imprisonment claims, and the procedural due process claim.[2]

_____

[2] The response to the motion for summary judgment also argues that Heffner and Satterfield's September 18, 2015 statements were coerced, violating their Fifth Amendment and due process rights. (Dkt. 112 at 24.) However, these claims are not asserted in the operative complaint, and cannot be considered at summary judgment.

The remaining claim alleges that the July 7, 2015 search was warrantless, and violated plaintiffs' Fourth Amendment rights. Although plaintiffs claimed in their complaint the search was warrantless, Dailey and Johnston have produced the warrant supporting the search. (Dkt. 110-2.) Plaintiffs now argue that the WPD officers, including Dailey and Johnston, began searching the property prior to the issuance of the warrant. (Dkt. 113 at 5-6.)

As a general rule, "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well delineated exceptions." *Coolidge v. New Hampshire*, 403 U.S. 443, 454-55 (1971) (citing *Katz v. United States*, 389 U.S. 347, 357 (1967)). Searches conducted pursuant to a warrant are considered reasonable under the Fourth Amendment. *Cf. id.*

The Supreme Court defines a search for Fourth Amendment purposes as government intrusion into an area in which an individual has a subjective expectation of privacy that "society is prepared to recognize as reasonable." *Katz*, 389 U.S. at 361 (Harlan, J. concurring). "Property used for commercial purposes is treated differently for Fourth

Amendment purposes from residential property." *Minnesota v. Carter*, 525 U.S. 83, 90 (1998). The "expectation of privacy in commercial premises . . . [is] less than a similar expectation in an individual's home." *New York v. Burger*, 482 U.S. 691, 700 (1987). There is no "reasonable expectation of privacy in areas of [a] store where the public [is] invited to enter and to transact business." *Maryland v. Macon*, 472 U.S. 463, 469 (1985).

Plaintiffs argue "that when the police arrived at the scene they did not have a warrant for their search," (Dkt. 112 at 16) and "[t]here is evidence that the search started (and perhaps was even completed) prior to the issuance of a warrant." (*Id.* at 22.)

MSTC held itself out as a medical marijuana dispensary open for business to the public. (Dkts. 110-9 through 110-13.) When WPD conducted an internet search for information about MSTC, it found a Yahoo business page (Dkt. 110-11) and a Yelp page (Dkt. 110-12), each listing MSTC as a cannabis dispensary. It also found pages for MSTC on two medical marijuana dispensary directories: wheresweed.com (Dkt. 110-9) and THCfinder.com. (Dkt. 110-13.) In addition, Felix testified his job was to sit at the front desk to "greet patients and

caregivers," (Dkt. 112-2 at 4), and the doors were kept unlocked for business hours. (*Id.* at 5.) However, he also testified that customers only walked through the front door without an appointment "occasionally." (*Id.* at 4.)

This evidence, when taken together, indicates that MSTC was open to the public. Its online presence, combined with testimony that it employed a receptionist to "greet patients and caregivers" (Dkt. 112-2 at 4) who came through unlocked doors during business hours, indicates the lobby area of MSTC – where WPD first entered the building – was the "area[] of the store where the public was invited to enter and to transact business." *Macon*, 472 U.S. at 469. Accordingly, there was a diminished expectation of privacy in that space, and the officers' entry into that space was not a search within the Fourth Amendment. *See id.*

Plaintiffs have also not created a genuine issue of material fact regarding whether the search started before the warrant was issued. Dailey and Johnston provide two pieces of evidence indicating that WPD did not commence the search until the warrant was issued. First, Johnston testified WPD "entered the premises, made it safe, requested a search warrant for the premises, and waited until a search warrant

was secured." (Dkt. 112-3 at 20.) When asked if "a search was then commenced after a search warrant was signed by a judge," Johnston replied, "correct." (*Id.*) Second, the police report from the July search indicates that the officers entered 29601 Hoover Road at 6:10 P.M., at which time "officers entered the business and secured the scene awaiting arrival on the signed Affidavit." (Dkt. 110-16 at 14.) Two hours later, at 8:10 P.M., Lienemann, the affiant, returned with the warrant and "officers began a search of 29601 Hoover." (*Id.* at 15.)

Plaintiffs argue that there is a genuine issue of material fact regarding whether the search of the property began before the WPD obtained a warrant. However, they cite only to the affidavit of Greiner's legal assistant, Madilyn Greiner (Dkt. 112-8), in which she states she contacted the district court that issued the warrant and was told that court did not keep time records for search warrants, only dates. (*Id.*) Plaintiffs argue that the question of when the search began "can only be resolved through witness testimony." (Dkt. 112 at 17.)

The parties have provided witness testimony, which tells a single story: the WPD entered a public area of a business, secured the premises, and waited to begin searching until they obtained a warrant.

Plaintiffs have failed to provide any testimony or other evidence creating a genuine issue of material fact as to whether the WPD, and Dailey and Johnston in particular, began searching the property before a warrant was obtained. Summary judgment is therefore proper as to plaintiffs' unreasonable search and seizure claim.

### C. *Monell* Claim Against Warren

"[W]hen execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts may fairly be said to represent official policy, inflicts the injury . . . the government as an entity is responsible under § 1983." *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658, 694 (1978). "To state a claim for relief in an action brought under § 1983, [plaintiffs] must establish that they were deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999).

Plaintiffs' complaint states that "Defendant City of Warren's efforts to stop the lawful transfer of medical marihuana within its borders" violated plaintiffs' rights to equal protection under the

Fourteenth Amendment. (Dkt. 59 at 14.) In their response to the motion for summary judgment, plaintiffs state generally that there is a "settled policy custom that caused a deprivation of Plaintiffs' constitutional rights." (Dkt. 94 at 21.)

Plaintiffs cite two statements to support the existence of this policy: one allegedly made by Dailey to Felix that "the Mayor did not want marijuana in the City, so it could be grown nowhere within the City" and one allegedly made by Martin to Mazurkiewicz that "you can't grow marijuana in the City of Warren." (*Id.* at 22.)

Plaintiffs make no argument that Dailey, Fouts, or Martin are final policymakers for Warren. "Municipal liability may attach for policies promulgated by the official vested with final policymaking authority for the municipality." *Miller v. Calhoun Cnty.*, 408 F.3d 803, 813 (6th Cir. 2005) (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469 482-83 (1986)). Plaintiffs attempt to show that Fouts has policymaking authority by implication, based on efforts Fouts made to prevent other disfavored businesses from operating within Warren city limits.

Plaintiffs first rely on a memo that Fouts issued on September 2, 2015, directing the Zoning and Planning Departments "to not consider

the establishment of any more used car lots in our city until a thorough review of the used car lot ordinance can be reviewed." (Dkt. 94-8.) However, plaintiffs provide a newspaper article, dated December 16, 2015, in which the Warren City Council overrode Fouts' veto of approval for a used car lot in city limits. (Dkt. 94-9.) This series of events not only fails to establish Fouts' *final* policymaking authority, it fails to establish a colorable constitutional violation. It also fails to establish any policy of the City of Warren related to medical marijuana.

Plaintiffs further rely on a "Special Media Notice" Fouts issued on May 23, 2014, in which he highlighted "city ordinance regulations for purchase and discharge of fireworks during the Memorial Day weekend" and expressed his opposition to the Michigan Fireworks Safety Act. (Dkt. 94-10.) Plaintiffs also provide a July 3, 2014 press release detailing Fouts' "all-out effort against illegal fireworks," setting forth various actions Fouts would take the next day to advise fireworks sellers about city fireworks regulations and crack down on violators of city fireworks ordinances. (Dkt. 94-11.) Like the used car lot memo, these two releases do not establish any unconstitutional activity by Fouts or Warren, and do not establish any policy related to medical

marijuana, nor do they reveal that Fouts is a final policymaker for the City of Warren.

Plainitffs also provide a January 11, 2016 news article in which Fouts called for a new ordinance regulating medical marijuana growth that "the City Council voted 4-3 to table . . . ahead of an expanded discussion on the matter." (Dkt. 94-12 at 2.) Finally, plaintiffs provide an April 8, 2016 news article in which Fouts is described as "put[ting] past battles over everything from medical marijuana cultivation in residential neighborhoods, to flamethrowers, fireworks and used car lots back in the crosshairs" during a State of the City speech. (Dkt. 94-15 at 2.)

The January 11, 2016 article established that Fouts could not make policy regarding medical marijuana without approval of the City Council. The second article lists medical marijuana alongside a list of other topics Fouts discussed, none of which have been shown to have been the subject of unconstitutional policies on the part of Warren. Even if those prior policies were unconstitutional, plaintiffs provide no reason why those policies would make the existence of an

unconstitutional policy regarding medical marijuana more likely to exist.

Finally, plaintiffs rely on the following quote, given by Green to a newspaper:

> "The mayor's job, and my job, is to provide safe neighborhoods. The worst thing is to not be able to live in peace in your house," Green said. "I think we all agree what the problem is. We all agree the problem is the mandate allows there to be a caregiver-to-patient relationship in residential areas."

(Dkt. 94-12 at 2.) This, plaintiffs argue, establishes that Green and Fouts "would together play a policy role in fighting the application of the state law on medical marijuana." (Dkt. 94 at 23.) Even if this were the case, it does not establish the *existence* of a policy or that either Green or Fouts were the final policymakers as to any such policy. Further, the Hoover Road property is zoned for commercial use, not residential use.

Plaintiff/counsel Michael Greiner has also filed an affidavit under Fed. R. Civ. P. 56(d), in support of his argument that plaintiffs should be permitted to depose Fouts. A party opposing summary judgment must show "by affidavit or declaration that, for specified reasons, it

cannot present facts essential to justify its opposition." Fed. R. Civ. P. 56(d). "Rule 56(d) does not permit a 'fishing expedition,' in which one party simply hopes to uncover some evidence that may help its case." *Peltier v. Macomb Cnty., Mich.*, Case No. 10-cv-10796, 2011 WL 3320743 at *2 (E.D. Mich. Aug. 2, 2011) (citing *Duffy v. Wolle*, 123 F.3d 1026, 1041 (8th Cir. 1997) and *Wappler v. Bravard*, 2008 WL 434037 at *10 (W.D. Mich. 2008)).

At this stage, plaintiffs have not alleged the existence of a policy that would give rise to their claim of liability under § 1983. Greiner also acknowledges that "much of the documentary evidence" plaintiffs rely on, including the aforementioned news articles, "is not admissible in Court." (Dkt. 83 at 7.) Greiner also does not argue that Fouts is a final policymaker whose proposed policies would expose Warren to liability. Plaintiffs have not presented specific reasons for Fouts' deposition, and have not described the essential facts Fouts possesses that would give rise to a cause of action.

Further, plaintiffs have failed to allege the existence of any policy that would give rise to a colorable claim of municipal liability that could be asserted via § 1983. As the affidavit states, plaintiffs' theory is that

their "rights have been denied them despite state law to the contrary." (*Id*. at 6.) To justify discovery pursuant to a Rule 56(d) affidavit, a party must "articulate more than simply the theory it intended to prove from the beginning." *Reliance Mediaworks (USA) Inc. v. Giarmarco, Mullins & Horton, P.C.*, 549 F. Appx. 458, 464 (6th Cir. 2013). The denial of additional discovery is further justified where the theory articulated – in this case, that violation of a state law also constitutes a violation of federal constitutional rights – could not lead to recovery for the party seeking the discovery, regardless of what is discovered.

### D. Motion for Order of Contempt

On March 8, 2017, the Court enjoined plaintiffs from any non-compliant uses of the property from which both Legal Real Estate, LLC and MSTC were operating. (Dkt. 77.) This meant that the MSTC could no longer operate out of the building at all, and only Legal Real Estate, LLC could operate in the building out of Suite A. On April 28, 2017, Warren filed a motion to enforce the judgment, which was actually a motion for an order deeming Greiner, Mazurkiewicz, and Felix to be in contempt of court, and seeking $4,000 in sanctions along with

permission to seize all marijuana and related items at the property. (Dkt. 88.)

Warren states that it attempted to schedule an annual fire inspection on March 16, 2017, but moved that inspection to March 23, 2017 at 1:30 P.M. at the request of plaintiffs. (*Id*. at 2-3.) On March 23, 2017, an attorney for Warren, the Fire Marshal, and a Fire Inspector went to the property. (*Id*. at 3.) Warren states that the three knocked and waited outside for over forty minutes, but nobody answered them. (*Id*.) They left voicemails for plaintiff Michael Greiner, as well. (*Id*.) Warren's attorney, Robert Morris, submitted an affidavit that he witnessed Felix approach the property, park on a side street, and then enter the property after Warren representatives left. (*Id*. at 3-4; Dkts. 88-6, 88-7.) At or around 2:30 P.M., Greiner called Morris and said that Mazurkiewicz and Felix were inside at the time Warren representatives were attempting to enter. (Dkt. 88 at 4.)

Warren noticed another inspection attempt for March 30, 2017 at 1:30 P.M. (*Id*.) Warren's representatives gained access and inspected only Suite A and part of the basement, which Mazurkiewicz confirmed was still a grow room to which only Felix had keys. (*Id*.) Greiner

refused the representatives access to the rest of the building absent a more specific court order. (*Id.* at 5.) On April 11, 2017, the Court held a telephonic status conference with the parties, during which Greiner agreed to make the entire property accessible to Warren officials for the purposes of inspection. (*Id.*)

Another inspection was noticed for April 24, 2017 at 1:30 P.M. (*Id.*) During the inspection, the Fire Marshal provided a copy of the inspection report from March 30, 2017, noting fire safety violations on the property. (*Id.* at 6.) Mazurkiewicz and Felix admitted they maintained three locked, operational marijuana grow rooms in the basement. (*Id.*) Warren moved for contempt on April 28, 2017, following this inspection. (Dkt. 88.) They seek an order finding plaintiffs in contempt and sanctions of $4,000, among other relief. (*Id.* at 8.)

In response, plaintiffs state that Mazurkiewicz discussed moving the marijuana plants out of the building at some point with Morris, and that Morris told him that Warren "understood that it would take some time to fully move out, and they did not expect our plants out immediately." (Dkt. 95-2 at 2.) Mazurkiewicz also stated that he and

Felix were in the building at the time of the first inspection, and left their phone numbers on the front door for the inspectors to call. (*Id.*)[3]

On May 31, 2017, the Court issued an order requiring defendants to provide all inspection reports and a checklist of all repairs or other actions plaintiffs were required to take to remove all warning signs Warren had placed on the building. (Dkt. 98.) The reports and checklist were due by June 2, 2017. On June 2, 2017, Warren filed a report containing the inspection reports and a checklist of nine actions to be taken to remove the warning signs. (Dkt. 99; *id.* at 4.)

On August 28, 2017, the Court issued an order requiring supplemental briefing regarding the status of plaintiffs' compliance with the inspection reports and the Court's previous orders. (Dkt. 115.) The parties filed their supplemental briefs on September 11, 2017. (Dkts. 120, 121.)

Warren stated in its supplemental brief that it noticed another inspection for August 16, 2017 at 9:00 A.M. (Dkt. 121 at 5.) Greiner challenged the city's authority to engage in another inspection, and stated he would only permit Morris, but not Warren's inspectors, to re-

---

[3] This information all comes from an unexecuted affidavit. (Dkt. 95-2.)

inspect the property. (*Id.*) When Morris, the Fire Marshal, and the Fire Inspector showed up, Greiner would only permit Morris inside to confirm that the marijuana plants were removed, but stated that the Fire Department would need a warrant to inspect the property. (*Id.*) The warning signs that were up had been removed by someone other than Warren officials. (*Id.*)

Plaintiffs state that they were never provided with a checklist of items to fix with the June 2, 2017 report. (Dkt. 120 at 2.) Plaintiffs do not dispute Warren's account of events, but state that the failure to provide a checklist itself violated the Court's order, and weighs against a finding of contempt.

A federal court may impose civil sanctions on a party who fails to comply with a lawful, specific court order. 18 U.S.C. § 401(3). "With respect to civil contempt proceedings, judicial sanctions may, in a proper case, be employed for either or both of two purposes; to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained." *Elec. Workers Pension Tr. Fund of Local Union # 58, IBEW v. Gary's Elec. Serv. Co.*, 340 F.3d 373, 379

(6th Cir. 2003) (citing *United States v. United Mine Workers of Am.,* 330 U.S. 258, 303-04 (1947)).

"In order to hold a litigant in contempt, the movant must produce clear and convincing evidence that shows that he violated a definite and specific order of the court requiring him to perform or refrain from performing a particular act or acts with knowledge of the court's order." *Elec. Workers*, 340 F.3d at 379. Once this evidence has been produced, it is the non-movant's burden to show that he cannot presently comply with the court's order. *United States v. Rylander*, 460 U.S. 752, 757 (1983). To meet this burden, "a [party] must show categorically and in detail why he or she is unable to comply with the court's order." *Rolex Watch U.S.A., Inc. v. Crowley,* 74 F.3d 716, 720 (6th Cir. 1996) (quotation omitted).

At a telephonic status conference, the Court asked Warren to provide an itemized description of their claimed damages from the actions it contends constitute contempt of the Court's order. On February 9, 2018, Warren instead filed a declaration from its counsel setting forth the general fees and costs it accrued during this litigation as a whole. (Dkt. 123.)

First, Warren has not shown that sanctions would coerce plaintiffs into complying with the Court's order, which required plaintiffs to permit inspections and bring the property into compliance with the inspection reports. Instead, Warren seeks additional powers that would allow it to remove and destroy plaintiffs' marijuana and related items. What Warren seeks is not an order that would coerce compliance with the Court's original directive, but instead an entirely new directive that would permit Warren to take actions never contemplated at the time of the first order. The Court declines to enforce sanctions on these grounds.

Second, Warren has failed to show specific, compensable losses related to plaintiffs' alleged contempt of the Court's order. Warren seeks $4,000 in damages arising from attempts to enforce the Court's prior order. What Warren submitted as proof of those damages is a declaration setting forth nearly $323,000 in fees and costs incurred from the inception of this litigation, none of which are specific to Warren's enforcement efforts arising from that prior order. The Court cannot award money to compensate Warren for losses stemming from

plaintiffs' actions when it has not specifically demonstrated any losses it suffered arising from those actions.

Warren's motion for an order holding plaintiffs in contempt and for sanctions is denied.

## IV. Conclusion

For the reasons set forth above, it is hereby ordered that:

Defendants' motions for summary judgment (Dkts. 82, 110) are GRANTED;

Warren's motion for an order of contempt (Dkt. 88) is DENIED; and

This case is DISMISSED WITH PREJUDICE.

IT IS SO ORDERED.

Dated: April 17, 2018          s/Judith E. Levy
Ann Arbor, Michigan        JUDITH E. LEVY
                                     United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on April 17, 2018.

                                 s/Shawna Burns
                                 SHAWNA BURNS
                                 Case Manager